Good morning, Your Honors. My name is Michael Kagan. I represent the petitioner, Christian Lopez Alfaro. I'd like to reserve two minutes for rebuttal, and I'll try to manage my own time. Let me ask you a couple of first questions, just to get started. Absolutely. CAD is not at issue here, right? I think CAD is essentially subsumed by the withholding of removal issue. It's very difficult to imagine. Well, I didn't see it in here, but I knew it was appealed along, but it isn't here, so I just want to make sure I haven't got to worry about CAD. I think you're correct about that, Your Honor. And family membership as a protected class is not in this, right? That's correct. And a gang member targeting your client for being LGBTQ or whatever is not in this, right? I wouldn't quite agree with that. The primary danger to LGBT people in El Salvador is the government, but the gangs are not in our program. But I didn't see that in your brief anyplace. That's all I'm trying to do. I'm just trying to eliminate the issues I didn't see. I understand the primary danger is the government, for sure, as well as, but there are some non-government organizations mentioned as well. Well, I just didn't see it brief, so I just wanted to make sure. Absolutely. Okay. That's where I am. The withholding – We're on to withholding now. Well, I was hoping, although obviously subject to your questions, to start with the discretionary denial of asylum issue.  On that issue – Let me focus you on that. You may be anticipating in going there anyway, but my concern is this. If we agree that you have a meritorious argument on the withholding claim, what's your best argument that the asylum claim should also go back for reconsideration given that the denial was based on discretionary grounds? So if the court rules in our favor on withholding, there's a regulation that would require reconsideration of the asylum denial as well on that basis alone. And it would still perhaps be relevant in that the same negative and positive factors would be assessed by the immigration court. We noted that in our brief. Sorry, I don't have that page number right now, but there's a clear regulation that I don't think is ambiguous. If we prevail on withholding, it has to be reconsidered on asylum. Even if they've already done that balancing and correctly did so, or at least didn't abuse their discretion in doing so? Well, part of – under this – under a matter of pull-off from the board and under this court's precedent, if the risk of future persecution is a major factor in weighing the positives and negatives on asylum discretion. So if the immigration judge was wrong, as we argue that she was, regarding withholding of removal, by definition, the analysis on asylum discretion would have to be reviewed because it would have been based on an incorrect input essentially. But to Judge Nguyen's question, if we agreed with you on withholding of removal and found that that had merit, why have a redo on the discretionary denial of asylum if there's an alternate basis that would preclude future persecution? Asylum is a far more generous benefit than withholding of removal in many different ways. One of them that's very active in the courts right now is the question of third-country removal. And there's case law that the – that an asylum denial, even when someone has withholding, can still actually lead to review by this court. But withholding of removal does involve a removal order. And so there is a – I don't want to predict exactly what would transpire. But there's a judicial efficiency argument perhaps in resolving both issues if it is possible. Let me ask you – let's get into the merits of the asylum discretion. We're reviewing for abuse of discretion, correct? Why would it be an abuse for the board to have considered these recent acts, including a felony conviction for a weapons offense, which I think is the most serious of the several? Sure. I agree with that. It is abuse of discretion, but it's abuse of discretion informed by Acardi and Kaiser. The problem with the discretionary analysis from the agency is that it violated its own rule that only the, quote, most egregious factors should outweigh the risk of future persecution and the past persecution. And this criminal record of petitioner is definitely serious, but it's not the most egregious or most offensive type of criminal conduct that we know in our system. So what case do you rely on for the notion that most egregious is something more serious than a felony weapons offense? I don't know that I have a case specifically on a felony weapons offense, but I would note that it's a mere possession, most likely of a BB gun. And I think that I'm – what we're relying on is the ordinary meaning of the – I guess the follow-up would be, well, what precedent is the board not following when it discretionarily denies when someone has been convicted of a felony firearms offense? The – in matter of PULA, the board itself gave a quite strenuous explanation for why the most egregious standard needs to be strenuous because of the danger that people face in cases like this. It's a situation of particular concern. This court in Gullah, other circuits have all said that these type of denials should be rare. The Eleventh Circuit said it should be exceedingly rare. And the Second Circuit said that the circuit courts enforce extensive limitations on these discretionary denials, and that comes really from a CARTI, that, yes, it is discretionary in the statute. But the agency has established a rule, and for good reason, given the structure and the concerns of this particular statute, which have the gravest human concerns. So this court can enforce – Well, it seems to me, counsel, I think you're making two separate arguments. One is you're saying, well, if we buy your argument on the withholding, the asylum somehow has to go back. And that argument would have a lot more force if they had erred on the analysis of whether there was a well-founded fear. But here they got to the second step. So your second argument is, well, in weighing the positive factors versus the negative factors, there was an abuse of discretion. So now getting to that weighing, it seems to me that the IJBIA understood what the parameters of the law is. And in weighing the egregiousness of the criminal history, they did note the drug use, the extensive nature, as well as the recency of the criminal history. So sending it back on that discretionary ground is difficult. I don't know what would change other than saying, well, we would have weighed it differently. So obviously it is certainly possible. It's not what we ask. But it's certainly possible for the petitioner to prevail with you on withholding a removal and not on discretion. There are two very different arguments. I do think the regulation really does require a review. I think it's fairly explicit. Perhaps we would not prevail with the immigration court at that stage on discretion as well. But I think that it would require sending that back simply because of that regulation, even if you disagree with me on all of the other arguments that we've made. Okay, if we change to withholding now, I mean, I appreciate my colleagues' questions there as it relates to the asylum claim because I frankly had some of the similar questions. When I look at the withholding, it seems to me, and this is just me telling you how I've kind of looked at this, seems to me the standard for withholding is higher than that, which you've already said would be for asylum. It would be a more likely than not standard. And then I have to look for substantial evidence in the record which would sustain the more likely than not standard. And then can only reverse if the record is contrary, not contrary, but compels a contrary conclusion that the persecution is more likely than not. So the IJ addressed specific theories of harm. He addressed the church-related violence, the country conditions, the police misconduct, the state of emergency, the association with the transgender fiancé. In each one of those instances, he addressed each one of those circumstances. So if we look at the church-related violence, as the violence only occurred one time, 2012, 2013, no violence is in the churches since then. So I guess I'm saying to myself, he says past incidents are isolated and dated. Why does that compel a contrary conclusion? I mean, I'm on a substantial evidence. That's the lowest evidence standard. I mean, they just got to have some evidence. Why is that compelling a contrary conclusion? Sure. Let me try to address that. I'll first talk about the church and then a broader argument about why I think substantial evidence actually does require the opposite conclusion. Regarding the church, first of all, given the – Well, I'm not really going to let you go to – I don't know what you just said exactly, but this is not a cat case. So we're not looking at lumping all the harms. We're in a withholding case. We have a harm on a protected ground, and one is looking at the harm for the protected ground. And so that's why I'm taking each one of these down through because we can't lump like we would in cat. I think withholding a removal case is easier to win than a cat case. Well, it may be easier, but given the standard and the substantial evidence review and that I can't lump all the things you might come up with in there because that's a cat case. I mean Colvie Holder is a cat case, not a withholding case. It is, but I don't think there's any principled reason I can think of to not use the aggregate risk analysis from Colvie Holder. Well, but just a minute.  Because it has to deal with cat, not withholding. And I got all kinds of cases that say in a withholding case, one looks at the harm suffered on account of the protected ground. So that's why I differentiate each one of these into the harm suffered. There are three major risk factors that put Mr. Lopez Alfaro in grave danger in El Salvador because he is gay. The one nexus factor that puts us in withholding. One is just all gay men in El Salvador are in danger that I think the parties agree about that, at least to the well-founded fear level. In addition, his family's association with this extremist church, which is not only a danger of the church directly hurting him, but also that the church could report him to the government and make it much harder for him to remain invisible, which is the only way a gay man could live safely. And then the last one is that he will be living with his transgender fiancee. The parties all agree that transgender women are in even more danger than gay men. So that already brings us to another level, making it even harder to imagine how he could possibly stay invisible and safe as a gay man in El Salvador. All of that relates to the nexus. Well, but the honest truth is you've got to get above speculative and unsupported by the record. So that's why I focused on the record. Let's talk. I mean, talking about the church, I said, what is the evidence? And I went through the evidence and I tried to say to myself, well, how does that compel a contrary conclusion then about church? If I go to country conditions, no question that there's discrimination and some violence against gay individuals. However, that does not compel a conclusion that harm is widespread or systematic, which is what Guru says I've got to have widespread and systematic. And beside that, the IJ based his decision on the fact that there's a population there, but anecdotal evidence didn't support the finding that your client would be targeted. And that was all there was, was anecdotal evidence. And now I have a substantial evidence review, and I say to myself, how can I say it's compelled? The on page 257 of the administrative record in his declaration, the petitioner said, I am afraid my parents will report me. And that related to their membership in this church. That's the connection to the adding of risk. In the Marcos case, this court said that immigration judges have to draw reasonable inferences. One of the things the immigration judge did here was insist that I need to see a piece of evidence for every little logical step. And that is almost always impossible in asylum and withholding cases. That's why Marcos says draw reasonable inferences. The inference that we think has to be drawn is that if a gay man is already at one level of risk, transgender women are at a whole other level of risk. And they are living together in an intimate relationship. That is going to make the gay man in more danger, not less. And not the same. That's a reasonable inference that should have been drawn. And also on substantial evidence, the record, there's severe dangerous problems with the type of statistical analysis that the immigration judge did. Because it relies on the assumption that we have reporting of the complete universe of abuses. We almost never do from any country. But to be fair, the immigration judge did not just leave that out. The immigration judge focused deadly on that all of those things are not reported. And went through and said, even though all of those may not be reported, the fact that he's going to get this is speculative and unsupported by the record. I mean, it isn't as if he didn't look at all the evidence. He looked at it and made a decision. And now I'm supposed to say, on appeal, having been a DJ and having the Court of Appeals look over my shoulder, that there is no substantial evidence to sustain what he did. I fear for my time management here. You're actually over time, but please answer the question. The more likely than not standard, first of all, does not require complete certainty. It is similar to the preponderance of evidence standard. And asylum and withholding cases always require predicting the future. In that sense, they can always be labeled speculative. But we have an extensive record. I would look at pages 356 to 358 just on the known cases and the underreporting of violence against LGBT people in El Salvador. That is quite a record. Plus what my client has himself witnessed, not so far in the past, in his childhood, with people closely associated with his own family. This court requires an individualized analysis and inferences about the real risk. My client is in very serious grave trouble if he goes back to El Salvador. We think substantial evidence pushes completely in the opposite direction of the immigration judge's conclusion. Thank you, counsel. Thank you very much. Good morning. Good morning, Your Honors. May it please the court. My name is Kosei Ugamori, and I represent the United States Attorney General in this case. This petition for review should be denied for two reasons. First, the agency reasonably denied asylum in the exercise of discretion, having considered the proper legal framework, the appropriate context, and the totality of the circumstances. What about this regulation that counsel points out, that if we go the other way on withholding, we have to send back asylum as well? Well, in this case, the government submits it's not necessary to do so. He was given the strongest, the most favorable context in the sense that his case was considered under the board's framework, that the likelihood of persecution should generally outweigh all but the most egregious factors. And the egregious factors in this case outweighed those factors. So it would be unnecessary to send it back for a discretionary determination. Are we allowed under the regulation to determine that particular issue, whether it's unnecessary or not? Or are we demanded under that regulation to send it back? Well, I mean, I'll be fair. I read the regulation, and I was trying to say to myself, I'm not sure what this says. Well, the government's position is that it would be futile. But in principle, the agency should be the first to address discretionary denials in the first instance. That being said, I would point this court to Hosseini versus Gonzalez, which is decided in 2007. In that case, there was, I believe, an Iranian alien who was denied asylum in the exercise of discretion, denied withholding, and denied cat protection. And the court upheld the discretionary denial of asylum in that case, notwithstanding that subsequently, later on in the decision, it reversed the cat protection claim and also remanded for withholding the removal. So that would be an example of where this court did not remand, notwithstanding that the agency's ruling had changed. But let me ask you about that because Kaloubi tells us that we should look at, and the agency as well, a fear of future persecution. And in that case, the discretionary – sorry, the denial of asylum on discretionary grounds was upheld because withholding of removal had been granted. But here you have denial under asylum and denial under withholding. Is that a potential abuse of discretion if there's a reasonable possibility of persecution and yet this person may be sent back anyway? No, Your Honor. In Kaloubi, the court did state, I think, a principle that stands to reason, which is that not everyone who establishes eligibility for asylum should be granted asylum in the exercise of discretion. Doing so would make the discretionary aspect of asylum meaningless. And in this case, the board applied the proper framework. That's not disputed. It also considered the appropriate context, which is that it understood that there was a likelihood of persecution in this case. And it proceeded to weigh the remaining positive factors and the very serious negative factors in the case that was described earlier. So under those circumstances, there is not an abuse of discretion in this case. And what the petitioner proposes is essentially a rule that an individual, if he is not convicted of a crime that is akin to murder, rape or robbery, that he is entitled to asylum in the exercise of discretion. And matter of Pula does not hold that. Matter of Jean does not hold that. And there is no precedent in this court that holds that as well. In fact, this court has upheld the discretionary denial asylum in cases that do not reach the level of murder, rape or robbery as shown in the government's brief. And as this court is aware in Hosseini, for example, that was too. It was a serious fraud on the government. He had used the wrong guy. He used different identity, different numbers and submitted to bogus asylum applications. And Kim versus Whitaker is decided by this court in 2018. It's an unpublished decision. So the details are a little thin. However, this court upheld the discretionary denial of asylum based on the alien's conviction of I believe it was a loitering with the intent to engage in prostitution. And with the aggravating factor that this person had failed to disclose that conviction during immigration. Let me let me turn you to the withholding claim, because one of the concerns that I had with the decision was its application of the more likely than not standard. And I just there is a great deal of colloquy with Judge Smith and your friend on the other side about the substantial evidence standard. But would you agree that if the IJ airs in its application of a legal standard, we would not be looking at substantial evidence. We would be sending it back for the for the agency then to redo the analysis into the proper legal framework. Taking the hypothetical at its literal face. Yeah. If there is a legal error, that would not be a substantial evidence question. Right. But here the question is not a legal one. It's a factual one. Well, this is what I want to get into. One of the things that the IJ relied on for finding not more that that this was not more likely than not, was that it noted that there were six hundred and ninety two documented cases of violence against LGBTQ people in a country with a population of six million, which falls far short of establishing that Alfaro is likely to experience violence. Why that seems to me to set an impossible standard. Does that mean that Alfaro was required to bring forward cases that was a numerical majority of the population in order to establish more likely than not? No, your honor, there is no such requirement. What the immigration judge was doing was addressing the evidence that was submitted by the petitioner himself. Recall that it is petitioner's burden of proof to establish eligibility for withholding the removal. Right. But my but my question is, if you have six hundred and ninety two cases, what do we make of it? And if what the IJ is applying is, well, that's not that doesn't create a clear probability of more likely than not, then it seems as if the IJ was applying this based on a group basis and not on an individualized manner, which it was required to do. I understand the question, your honor. But two responses. First, this is not a pattern or practice claim. And second, again, what the IJ was doing was dealing with petitioner's evidence. So all the IJ was saying was, well, here is your burden of proof. This is the evidence you submitted and the evidence you submitted shows six hundred and ninety two cases. And the immigration judge acknowledged that not all cases are reported. There is a lot of underreporting going on and that that may that probably is not the real picture. But what's the import of in a population of six million? Because it says in a population of six million falls far short of establishing likelihood. That seems to me a misstatement of a legal standard. It's a misapplication of the more likely than not standard. Well, the question here is whether the evidence compels the conclusion in the petitioner's favor. Not if the legal standard has been misapplied. The government respectfully requests that, disagrees that the immigration judge applied a different legal standard. It was looking at data that the petitioner himself submitted and said that doesn't show that it's more likely than not. Let me ask. Let me ask you this then. Another concern that I had was that Mr. Alfaro raised evidence that of the likelihood of harm from gang members targeting people in the LGBT community and in combination with with his transgender partner. I didn't see anywhere the IJ addressing that risk of harm. You know, there was some discussion earlier on about the gang members having targeted him in the past for other reasons. But I didn't see anything about the possibility of a risk of harm of being targeted because of his LGBT status by gang members. Was there something in the record that I missed? So are you sorry? So first and foremost, I think it's important to note at the beginning, the petitioner conceded that he is not alleging persecution on account of sexual orientation based on a fear of gangs. So I think that's established. But that way, where is that established? I mean, he brings up the fear of harm from gang members who would target him on the basis of LGBTQ status and the and the government acquiescing to that risk of harm and not protecting him. Right. Earlier in a colloquy with Judge Smith, the petitioner so conceded your own. But that being the case, I think. Well, I'm asking you because I'm I'm I'm seeing the record differently and finding that to be a claim presented. And there's evidence presented the IJ. And there was nothing in my view that the IJ did to respond to that evidence and claim. Is that is that a material omission of the analysis? I don't think the concern is showing up in the country where there's a serious threat that gang members and others could also target people of LGBTQ status and their transgender partners and that the government would acquiesce and do nothing about it. Shouldn't the IJ have addressed that issue? Well, I believe the IJ did, Your Honor, because it looked at the entirety of the evidence. Can I can I follow up on that? Because I have some of the same concerns that Judge Sanchez discussed with you. The BIA seemed to say that, well, you know, here's the evidence that you presented, particularly on the church and its acts of violence against two gay men, I think, in 2012, 2013. So the IJ did talk about that incident. But I'm looking at excerpts of record pages 61 and 62. I see a generalized discussion of the church and his connection to the church. Other than those two specific incidents, I don't see an individualized consideration of the petitioner's circumstances. His fear of being outed because of his connection to the church, his engagement to a transgender individual, which would then increase his risk and maybe that which he's kept hidden. And so how individualized does the IJ have to consider the record that he presented? Because to me, these discussions are very general and that ties into the citation of statistics that Judge Sanchez discussed earlier with you. Didn't the IJ have to go to the heart of what puts him particularly at risk? So the IJ did that here, Your Honor. Well, I don't see it unless I'm missing it. I'm looking at 61, 62, and there's some discussion of the church, the two incidents, and then getting to the statistics and talking about how he hasn't met his burden of proof. But there's no engagement of his specific circumstances and the risk that he would face. So the point of that analysis there was that there was a time in 2012 and 2013 when he had witnessed these individuals being dragged. So that's his personal experience. Now, the question is, does that personal experience compel the conclusion that he will be targeted for future persecution? And the relevant analysis that the immigration judge engaged in is that, well, since 2013, this church has not harmed anybody or reported to have harmed anybody in the same way. So there might be a reasonable possibility of persecution. But in this particular circumstance, because he's in constant contact with his mother and yet there has not been more recent reports of El Dios Vivo engaging in this type of despicable behavior. But he did submit a transcript of a recent sermon that was, in his view, holding extremist views, anti-gay views in the sermon that happened just a couple of years, a year or two ago. And there was no discussion by the IJ as to the church's current extremist views of that population. And so when you combine that, I guess the judgment's point, when you combine his past history where he witnessed and was found credible, by the way, that two people were beaten up and dragged in the streets. The police were present. They did nothing about it, that there were church members that did this, and that the church is currently saying very hostile anti-gay views as a basis for why he has a current fear of harm. It seems to me that it would be incumbent on the IJ to address those individualized – that individualized evidence that pertains to him. So I don't think it's disputed that the church holds these views. The question is, is the church going to act on it? And it did act on it in 2012 and 2013, which is why there's a reasonable possibility. But despite having those views, there has not been any more reports of that occurring. In fact, not just El Dios Vivo, but any other church or religious organization, the immigration judge found that there was no evidence of physical harm against LGBTQ individuals. So the question here is not the church's point of view. It is whether there will act on that point of view in a way that rises to the level of persecution, and that certainly is not the case here. So the question here, again, is whether the evidence compels the conclusion that the petitioner satisfied his burden of proof to show an individualized risk of persecution. But not if the IJ is not engaging in the required individualized inquiry that he or she – I forgot if the IJ was a man or a woman – that the IJ has to do. And so I think what we're highlighting is there's this problematic language about statistics that suggests that you have to have a majority of the population. You have no engagement with recent evidence of hostility from the church views. And then you have this other thing about the IJ addressing the transgender partner but only in the context of saying that there's no evidence that he would be more at risk of harm than the transgender partner. When I think the point was what's the risk of harm of the two of them together? And so there's – it just seems as if the IJ was not engaging in an individualized inquiry of what the actual evidence was that pertained to the harm that he might suffer. Well, as far as recent activities of the church, the reason why there is not that analysis is because there is no – he never alleged that the church has recently targeted these individuals. That's precisely the failing in this case is that it's his burden of proof, and he failed to submit sufficient evidence. And with respect to likelihood of harm on account of sexual orientation based on his association with his fiancée, the question is not whether they will be persecuted. It's his application, Your Honor. His fiancée is a U.S. citizen. He has to show that he will be targeted on account of his sexual orientation and be persecuted based on that. And on the record here, the evidence simply does not compel that conclusion. The immigration judge considered all of the evidence in this case. The board also reviewed it. And it is really the standard of review here that controls. There are ways to look at the facts to try to kind of maybe discern, try to characterize that as a legal error. But at the bottom, what we have here is an IJ that looked at the evidence that was submitted. The statistics were his evidence, Your Honor. It looked at the evidence. It considered his claims, and it found that he had failed to meet his burden of proof. Before we let you go, can I ask you one last question? Is it your view that an aggregate analysis only pertains to CAT claims, or does it also apply to a withholding or removal claim for a more likely than not standard? So in this case, the immigration judge did accumulate the harms. No, no, no. My question is, as a legal standard, doesn't the IJ have to accumulate the harms also for withholding or removal claims and not just CAT claims to apply the more likely than not standard? Well, the aggregation standard under CAT only applies to CAT, Your Honor. But the question of whether somebody is more likely than not to be persecuted in the future, that question, that prediction is – it's going to depend on… You accumulate the individual risk factors. You can't always do that because under asylum and withholding or removal, the question is whether the person will be persecuted on account of a particular ground. And so it may not be that I believe – this would be – a comparable situation would be like if a person is harmed on account of two separate grounds. You can't accumulate those harms. That's established by this court. So it would be the same analysis. It's really a factual question of what might happen in the future. Actually, it said in its decision that it did, in fact, accumulate all the harms and found that there was not a likelihood of harm. All right. Thank you, counsel. You're over time, but let me see if Judge Smith has any questions. All right. Thank you. I think you're both out of time. We appreciate your argument. The matter is submitted.
judges: SMITH, NGUYEN, SANCHEZ